Jos. Hinds et al., trading as Hinds, Ketcham & Co., Appellants, *v.* Henry Battin et al., trading as Scranton Match Co.

*Limited partnership association—Recording articles—Contract—Individual liability of members.*

The failure of a limited partnership association to record its articles before the commencement of negotiations which culminated in a contract after the articles are recorded, does not render the members of the association liable as individuals or general partners for the goods delivered to the association under the contract.

Before the articles of a limited partnership association were recorded, the association gave an order for goods. Subsequently, by agreement of the parties, a new order was given superseding the old one, conditioned upon the approval by the association of certain samples of the goods which were to be delivered. After the contract was thus modified the articles of association were recorded. After the recording of the articles, the samples were delivered to the association and approved. *Held*, that the members of the association could not be held liable as general partners for the contract price of the goods delivered.

Argued February 19, 1894.    Appeal, No. 87, July T., 1893, by plaintiffs, from order of C. P. Lackawanna Co., Oct. T., 1888, No. 299, overruling exceptions to report of referee.. Before WILLIAMS, MCCOLLUM, MITCHELL, DEAN and FELL, JJ.    Affirmed.

Exceptions to report of referee.

From the report of the referee, H. A. Knapp, Esq., it appeared that on Nov. 1, 1886, defendants drew up and signed articles of association for the purpose of forming a limited partnership under the act of June 2, 1874. Defendants paid in the whole of their subscriptions prior to April 23, 1887. The certificate was in proper form, but was not recorded until April 23, 1887.

The referee reported further facts as follows:

"The Scranton Match Company, Limited, completed their plant for the manufacture of matches about the 1st of May, 1887, and commenced the manufacture and sale of matches, and continued the same until the 21st day of May, 1888, when, by reason of losses in their business, they went into liquidation and appointed A. D. Holland, C. H. Scharar and C. M. Rouse

liquidating trustees under the provisions of the eighth section
of the said act of June 2, 1874.

" On or about Dec. 14, 1886, Mr. C. F. Griffin, an agent and
traveling salesman representing the plaintiffs, came to the city
of Scranton to negotiate with the defendants for the sale of
match boxes for the new concern.    The plaintiffs were at that
time engaged in the business of manufacturing articles of a
somewhat similar nature to match boxes, and the printing of
labels, show cards, etc.    Their manufacturing establishment
was in the city of Brooklyn, in the state of New York, with
branch offices in New York city, Chicago, Baltimore, Boston
and Pittsburg.    Some correspondence had been had prior to
Dec. 14, 1886, between Colonel S. Broadbent, who appears to
have been the leading spirit in the organization of The Scran-
ton Match Company, Limited, and the plaintiffs, which cor-
respondence resulted in Mr. Griffin's coming to Scranton as
aforesaid, for the purpose, if possible, of arranging to supply
the new concern with their match boxes, and such other articles
of like nature as they might need in their business.    Upon his
arrival in Scranton Mr. Griffin met Mr. Broadbent and Mr. Zim-
merman, and it was arranged that there should be a meeting at
the office of Mr. Zimmerman on the evening of Dec. 14, 1886,
for a consideration of the subject.    Upon that evening five of
the above named defendants, to wit: Mr. Broadbent, Mr. Zim-
merman, Mr. Benore, Mr. Battin and Mr. Martin met Mr. Grif-
fin, and Mr. Griffin submitted to them his proposals for the
manufacture and delivery to the new concern of match boxes,
and wrappers to be put around match boxes; and an agreement
was then and there entered into that Hinds, Ketcham & Co.
should have the order at prices named, for a large quantity of
these match boxes and wrappers.    The match boxes were to be
of three different sizes; one size to hold two hundred matches,
another size to hold three hundred matches and the third size to
hold five hundred matches.    Each box was to consist of two parts,
which may be called the outside and the inside.    The outside
was a pasteboard tube; the inside was of pasteboard to slide
into the outside tube.    There was to be a design printed upon
the outside tube.    The wrappers were also of three sizes, and
each wrapper was to be of the proper size, and arranged so that
twelve boxes of matches could be packed in it, and this wrapper

was also to be printed and have some kind of a design upon it.
The design upon the match boxes was to be printed in four
colors, while that upon the wrappers was to be printed in one
color.    Mr. Griffin stated to the parties that in order to get the
prices down to the lowest possible limit, it would be necessary
for them to order a large quantity of the goods; and the order
was given for three million match boxes, of which nearly
two and one half million were of the size to hold two hundred
matches, and the balance divided between the other two sizes.
The number of wrappers ordered was 266.000, distributed be-
tween the three sizes in the same proportion as the boxes were
distributed.    The price agreed upon for the boxes was for three
sizes respectively, $1.82 per thousand; $2.00 per thousand;
$2.65 per thousand; and for wrappers respectively $3.00 per
thousand; $4.00 per thousand; and $6.67 per thousand.    By
the terms of the agreement the boxes were to be delivered at
the rate of 30,000 per week from the time of the first delivery
which, it was fully understood, was not to be until the defend-
ants had their plant arranged for the manufacture of matches.
The wrappers were to be delivered at the rate of 2,600 per week,
dating from the same time.    Mr. Griffin had with him some of
the printed order blanks of the plaintiffs which were filled out
by him and signed by Mr. Zimmerman and Colonel Broadbent
as follows:

"Mr. Zimmerman signed the name Scranton Match Com-
pany, Limited; underneath that name Colonel Broadbent
signed, per Col. S. Broadbent, president, and underneath that
Mr. Zimmerman again signed, R. A. Zimmerman, secretary
and treasurer.    These orders were partly written and partly
printed.    [Here follows the order.]

"These orders were executed conditionally to a certain ex-
tent, the conditions being that they were to be approved by
Hinds, Ketcham & Co., and proofs were to be furnished to the
match company and approved by them.

"At the time of this interview of five of the defendants with
Mr. Griffin, the agent of the plaintiffs, Mr. Zimmerman, one
of the defendants, explained to Mr. Griffin the nature of the
organization of The Scranton Match Company, Limited.    The
certificate of association was read to him by Mr. Zimmerman
and he was informed fully as to the fact that the plant of the

new company was not yet in existence and would not be for several months; that the capital stock was $12,000, which had been all subscribed for by the six gentlemen named in the certificate in equal proportions, and that the liability of such subscribers was limited by the act of assembly under which the concern was organized to the amount of their subscription as aforesaid.

" [Within a few weeks after this order had been given as aforesaid, Col. Broadbent and others who were actively engaged in the affairs of the new company, concluded that the match boxes and wrappers as they had been arranged for, were going to cost them more than they could afford to pay, and considerable correspondence ensued between Col. Broadbent and Hinds, Ketcham & Co. concerning a change or modifica-. tion of the terms of the order. During the months of January, February and March many letters passed between these parties upon this and also upon other subjects. Samples of the match boxes were sent by plaintiffs which, in some respects, were found unsatisfactory. Col. Broadbent conceived that a saving might be made in changing the printing from four colors to one color, and correspondence was had as to the difference in price if this change was made. Finally on or about March 29th, Mr. Griffin again came to Scranton and saw Mr. Broadbent, Mr. Zimmerman and Mr. Benore, and it was agreed that certain changes should be made in the orders. The material of which the inside slide of the match boxes was to be made was changed to a cheaper grade of material, a sample of which was to be furnished for the approval of the match company. The number of colors upon the match boxes was changed from four to three, and the prices of all the match boxes were reduced, the changed prices being as follows: On the three sizes respectively $1.65 per thousand; $1.80 per thousand; and $2.16 per thousand. Prior to this change in the contract, the plaintiffs had submitted designs of the sketches and work of that character which was to be placed upon the match boxes and wrappers, and all of that appears to have been satisfactory to the match company, but the dissatisfaction, or the manner in which the samples were unsatisfactory, appears to be in the manufacture of the boxes, and the spaces upon the wrappers which determined the location of the design thereon after the boxes were packed in the wrappers.] [11]

" [With the exception of samples, no manufactured goods were delivered to The Scranton Match Co. under these orders until May 7, 1887, when five hundred match boxes of the two hundred size were shipped to the match company. This shipment amounted to the sum of ninety-one cents, and the bill for the same was afterwards paid by the match company. On April 26, 1887, plaintiffs write concerning the material for the insides as follows : 'We expect to send you to-morrow samples of the insides. They will be made of heavier stock than your insides will be made of, but we could not get our stock in so as to send you these samples.' And on the following day, April 27th, upon the same subject, they say : 'We also express two or three dozen insides of two hundreds, three hundreds, and five hundreds. They are cut from same stuffs as outsides. We have ordered plain straw for insides and expect it to-day or to-morrow. As soon as it comes in we will make some insides for two hundreds, three hundreds and five hundreds, and send, and you can try the pasting on of the paper strips such as we sent you yesterday. We also send you by mail, in tube, what proofs we have to spare of outside or dozen wrappers, two hundreds, three hundreds and five hundreds. These proofs are on paper the nearest we had in stock, and are heavier than the edition we are to print for you.' On the 26th of May, 1887, after the shipment of five hundred match boxes had been received, Col. Broadbent writes to the plaintiffs as follows : 'Having arrived home from Philadelphia the past week I find yours of the 20th inst. awaiting me. The boxes you have shipped are all O. K. and you may proceed.' This letter is, as far as I can find, the first approval on the part of the match company of the materials of which, at least, all of the insides of the match boxes were to be made from.] [16]

" Goods were shipped by the plaintiffs to the match company in June, 1887, to the amount of $35.95, and were paid for by the match company afterwards. Goods were subsequently shipped by the plaintiffs to the match company during the months of July, August, September, October, November and December, 1887, and March, April and May, 1888, to the amount which, with the small bills of May and June, 1887, heretofore mentioned, make in all the sum of $3,906.67, upon which there was paid by the match company to the plaintiffs, in ad-

dition to the full payment of the bills of May and June, 1887, as before mentioned, the sum of $800, leaving a balance due to the plaintiffs for such goods shipped to the Scranton Match Company, Limited, as aforesaid, of $3,070.01.

" "Before the bringing of this suit the plaintiffs, by their counsel, offered to deliver the balance of the original order of three million match boxes and 266,000 wrappers.

" The amount which had been delivered as aforesaid in the previous finding of fact was about two thirds of the original order."

The referee found the following conclusions of law :

"1. Upon the recording of the articles of association of The Scranton Match Company, Limited, in the office of the recorder of deeds of Lackawanna county, on April 23, 1887, The Scranton Match Company, Limited, became a duly and legally organized partnership association under the provisions of the act June 2, 1874, and its supplements.

"2. [As all of the goods which the plaintiffs delivered to The Scranton Match Company, Limited, were delivered after the said 23d day of April, 1887, in order to hold the defendants personally liable as general partners, the plaintiffs must show a positive and unconditional liability assumed by them prior to April 23, 1887.] [17]

"3. [The contract of Dec. 14, 1886, was entirely avoided when on March 29, 1887, its terms were changed by agreement of the parties.] [12]

"4. [The contract of March 29, 1887, not being an unconditional one, but being conditioned upon certain samples of material, and samples of manufactured boxes, created no absolute liability on the part of the defendants until after the conditions were complied with, and as these conditions were not complied with until after April 23, 1887, which was the date upon which the organization of The Scranton Match Company, Limited, was perfected according to law, it cannot be said that the defendants assumed any absolute liability prior to the perfecting of their organization as aforesaid, and therefore this suit against them individually as general partners must fail.  The suit can be maintained against The Scranton Match Company, Limited, but cannot be maintained against the defendants as individuals.] [13]

"5. [The defendants are entitled to a judgment in this case.]" [18]

The following agreement of counsel, marked exhibit "C" was given in evidence before the referee:

"It is agreed that the plaintiffs upon the trial of this case shall not be obliged to produce their books of original entries of the goods sold and claimed for in this suit, and that the amount of said goods delivered under the original order of December 14, 1886, as shown by the annexed bill, amounting to the sum of $3,070.01 is correct. This agreement is made upon the condition that the agent of plaintiffs, who took the orders for the goods, shall be present at the trial of the case. So agreed Nov. 12, 1890."

Exceptions among others to the referee's report as in brackets were overruled, and judgment entered for defendants, in an opinion by GUNSTER, J.

*Errors assigned* were among others (11–13, 16–18,) overruling exceptions; (55) entry of judgment; quoting exceptions and decree.

*W. H. Jessup, W. H. Jessup, Jr.,* and *Horace Hand* with him, for appellant.—When plaintiffs received the order and accepted it, and notified defendants that they would submit proofs, to be approved by them, it formed a contract on their part which defendants could enforce; and when defendants received the proof and accepted it, the contract became final and complete on their part. The agreement exhibit "C" admits that it was in force when all the goods sued for were delivered. The only change was in the price of the boxes.

Defendants were admittedly general partners, doing business as the Scranton Match Company, Limited. Plaintiffs contracted with them under that name; they said they were a partnership limited; but the record disclosed the fact that they were not, as no certificate had been recorded to bring them into existence as such: Hill v. Stetler, 127 Pa. 145.

The recording of the articles was not notice to plaintiffs. The statute does not make the recording notice to all the world. It simply requires that the certificate be recorded to bring the association into life: Sheble v. Strong, 128 Pa. 322; Gearing v. Carroll, 151 Pa. 79.

To constitute one a partner as to third persons, it is not necessary that he should agree to share in the losses of the business ; sharing in the profits is sufficient : Manhattan Brass Mfg. Co. v. Sears, 45 N. Y. 799 ; Everett v. Coe, 5 Denio, 182 ; Lynch v. Reynolds, 16 Johnson, 40 ; Parsons on Part. 51 ; Eliot v. Himrod, 108 Pa. 569.

The partnership was not registered in the prothonotary's office, as required by act of April 11, 1851, §§ 13, 14, P. L. 615.

*Everett Warren, E. N. Willard* with him, for appellees.— The execution of the original order did not in itself constitute a contract, but entitled the match company to one in accordance with their terms and the agreement made by the parties. To make it a binding contract it would have had to be independent of conditions requiring the future assent of the alleged promisors : 3 A. & E. Ency. L. 482 ; Hughes v. Clyde, 41 Ohio, 339 ; Hunt v. Wyman, 100 Mass. 198.

The findings of facts by the referee are conclusive and will not be reviewed : Bradlee & Co. v. Whitney & Kemmerer, 108 Pa. 362 ; Bidwell v. Ry., 114 Pa. 539 ; Com. v. Hulings, 129 Pa. 317 ; R. R. v. Moyer, 23 W. N. 554 ; Ellison v. Hosie, 147 Pa. 336.

OPINION BY MR. JUSTICE McCOLLUM, Oct. 1, 1894 :

All the equities of the case are with the defendants, and in accord with the judgment appealed from. In the negotiations which resulted in the contract under which the goods were delivered the defendants were not acting for themselves or a general partnership but for The Scranton Match Company, Limited, an association organized under the act of June 2, 1874, and its supplements. The plaintiffs, through their agent, knew the nature of the association, what had been done in the way of organizing it, what its capital was and the measure of the liability of its members. The statutes under which it was formed and the articles on which it was founded were read and explained to him, and his knowledge was theirs. With this information, the correctness of which is not disputed, they dealt with and furnished their goods to and on the credit of the association, and not until it passed into the hands of liquidating trustees in consequence of losses in business and the destruction of its

plant by fire, did they claim that the defendants as individuals
or general partners were liable for the goods so sold and deliv-
ered.   It was shown on the trial and found by the referee that
the defendants paid their subscriptions to the capital stock of
the association, and it is not alleged that its insolvency was
the result of fraud or mismanagement.   The plaintiffs' con-
tention is, therefore, not only opposed to the terms of the con-
tract and the understanding between them and the defendants
when it was made and the goods were furnished under it, but
to the equities of the case.   It is a contention based upon a
technicality which depends on their construction of the act of
1874.

It appears that the articles of association were not recorded
when the order of December 14, 1886, was made or when it
was changed on the 29th of March, 1887, but it is beyond dis-
pute that they were duly recorded sometime before the goods
were delivered, and before the contract under which the deliv-
eries were made became absolute and binding upon the match
company by its approval of the samples.   But the plaintiffs
contend that the defendants are precluded by their admission
on the trial from alleging that the deliveries were made under
the modified or new orders.   We do not think the admission
is entitled to the effect now claimed for it.   It related to ex-
hibit " C " and was manifestly made to dispense with the pro-
duction of the plaintiffs' books of original entries.   That it
was not intended to set aside the agreement of March 29th or
to deny to the same its legitimate effect upon the issue is ob-
vious from the proceedings on the trial and the statements of
counsel in their paper-books.   The learned counsel for the
plaintiffs, referring to this agreement in their history of the
case, said : " All the boxes and goods delivered for which this
suit is brought were furnished under the orders of Decem-
ber 14, 1886, as modified so far as price and quality of a por-
tion of the material were concerned.   By the arrangements of
March 28th or 29th, the plaintiffs went on and filled the orders
as fast as the defendants desired it, until the 2d of June, 1888."
These orders were mere proposals subject to the approval of
the plaintiffs and to the approval of the match company of the
proofs and samples of the goods.   Strictly speaking there was
no contract until these approvals were given, as they were in

the nature of conditions precedent to its existence. The original orders were changed on the 29th of March by the maker and approvers of them, and if at any time there was a binding and absolute contract in conformity with them it was avoided by the agreement then made. Whether the orders, recognized and acted upon after this agreement, are called new or modified orders, is of no consequence. Surely the approval of them and the samples furnished under them constituted a contract inconsistent with any contract arising from the approval of the original orders and the proofs submitted in pursuance of them. The samples furnished by the plaintiffs under the new or modified orders were approved by the association on the 26th of May, 1887, and thenceforth there was an absolute contract between the parties on the basis of these orders by which alone their rights and obligations in respect to the subject-matter of it were measured. It was a contract between the plaintiffs and The Scranton Match Company, Limited. Did the failure of the company to record the articles before the commencement of the negotiations. which culminated in the contract after they were recorded render its members liable as individuals or general partners for the goods delivered to it? We think not. It is the status of the association when the contract was made that must be considered in answering this question, and it is admitted that when it approved the samples furnished under the new orders it was qualified to enter into contracts in connection with and for the proper prosecution of the business for which it was organized. These views are in harmony with the learned referee's findings of fact and conclusions of law.

We have not deemed it necessary to notice seriatim the numerous specifications of error filed in the case although we have examined and considered all of them, together with the argument of the learned counsel in support of them. It is sufficient to say that we discover nothing in the specifications which in our opinion calls for or would justify a reversal of the judgment. They are accordingly overruled and the judgment is affirmed.